```
 1                    UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF DELAWARE

 3

 4     TQDELTA LLC,                  :    CA NO. 13-1835-RGA,

 5                                   :    13-1836-RGA &

 6              Plaintiff,           :    13-2013-RGA

 7                                   :    September 12, 2014

 8          v.                       :

 9                                   :    8:47 o'clock a.m.

10     2WIRE INC, ZHONE              :

11     TECHNOLOGIES INC, & ZYXEL     :

12     COMMUNICATIONS INC., et al., :

13                                   :

14              Defendants.

15     ...........................

16

17

18              TRANSCRIPT OF SCHEDULING CONFERENCE

19          BEFORE THE HONORABLE RICHARD G. ANDREWS

20              UNITED STATES DISTRICT JUDGE

21

22     APPEARANCES:

23

24     For Plaintiff:     FARNAN LLP

25                        BY:  MICHAEL J. FARNAN, ESQ
```

```
 1                           -and-

 2                  MCANDREWS HELD & MALLOY

 3                  BY:  PETER J. MCANDREWS, ESQ

 4

 5   For Defendants:   MORGAN, LEWIS & BOCKIUS

 6                  BY:  COLM F. CONNOLLY, ESQ

 7                  For Defendant 2Wire

 8

 9                  MORRIS JAMES LLP

10                  BY:  KENNETH L. DORSNEY, ESQ

11                           -and-

12                  ALSTON & BIRD

13                  BY:  ELIZABETH J. RADER, ESQ

14                  For Defendant ZyXEL

15

16                  SEITZ, VANOGRTOP & GREEN

17                  BY:  JAMES S. GREEN, ESQ

18                           -and-

19                  LATHAM& WATKINS

20                  BY:  JAMES L. DAY, ESQ

21                  For Defendant Zhone

22

23   Court Reporter:     LEONARD A. DIBBS

24                     Official Court Reporter

25
```

1                      P R O C E E D I N G S

2

3              (The proceedings occurred at 8:47 o'clock a.m. as

4     follows:)

5              THE COURT:  Good morning.  Please be seated.

6              MR. DORSNEY:  We have a dial-in.  I don't know if

7     anybody is going to use it.

8              May I hand it up?

9              THE COURT:  I don't know what it means, but go ahead.

10             All right.

11             So this is, I guess, a conference in TQDelta vs. 2Wire

12     Inc., Civil Action No. 13-1835, and TQDelta vs. Zhone, 13-1836,

13     and TQDelta vs. ZyXEL, which is 13-2013.

14             Mr. Farnan.

15             MR. FARNAN:  Good morning, your Honor.

16             Michael Farnan on behalf of plaintiffs.

17             With me today is Pete McAndrews of McAndrews, Held &

18     Malloy in Chicago.

19             THE COURT:  Good morning, Mr. McAndrews.

20             MR. MCANDREWS:  Good morning, your Honor.

21             THE COURT:  For the other side, Mr. Green.

22             MR. GREEN:  Good morning, your Honor.

23             James Green.  With me is James Day from Latham &

24     Watkins on behalf of Zhone.

25             THE COURT:  Okay.  Zhone.

1          All right.  Thank you.

2          Mr. Dorsney.

3          MR. DORSNEY:  Good morning, your Honor.

4          On behalf of ZyXEL, Ken Dorsney from Morris James.

5          With me is my co-counsel Elizabeth Rader from Alston &

6    Bird.

7          THE COURT:  All right.  Good morning.

8          Mr. Connolly.

9          MR. CONNOLLY:  Good morning, your Honor.

10          Colm Connolly from Morgan, Lewis & Bockius on behalf

11    2Wire.

12          THE COURT:  All right.

13          So Mr. Connolly, are you here just holding the fort, or

14    are you actually really involved in this case?

15          MR. CONNOLLY:  Somewhere in between, your Honor.

16          No, actually, I am certainly informed and prepared to

17    address any questions from the Court, but I'm going to let Mr.

18    Day lead the argument, although I might contribute today.

19          Actually, I did play some role in the proceedings

20    leading up to this.

21          THE COURT:  Okay.  Well, thank you.

22          Actually, to sort of help what I thought the issue was

23    going to be, I have a little hypothetical.

24          Kristin, could you just give -- could someone come

25    forward and get these?

1          You can take a minute to read this exciting

2     hypothetical.

3          Here's the thing.

4          I read the letters that were submitted about, I guess,

5     the Default Standards.

6          As I understand it, there is no particular contention

7     about the first one, which is plaintiff told defendants what

8     products they were accusing, right?

9          MR. DAY:  Right.

10         THE COURT:  All right.

11         So, then, there is kind of a half-hearted Complaint by

12    the plaintiff about the technical, the deficiency of the

13    technical production by the defendants, which I'm kind of

14    inclined to skip over right now.

15         And then the third one, which is more vigorous on both

16    sides, has to do with whether the infringement contentions this

17    time are sufficient to go forward, right?

18         MR. MCANDREWS:  Your Honor, if I just may say something

19    about your first point there, skipping over the core-technical

20    documents.

21         We didn't mean to intend that it's not the dispute that

22    is very important to us.  We didn't think that this was the

23    right time to raise it.

24         THE COURT:  Well, no, no.  I saw you might ask the

25    Court's help later on.

1          So, I wasn't trying to suggest it's not very important,

2     even though what I gathered from what you said in your letter

3     was that, in fact, whatever they produced so far hasn't played

4     any part in your infringement contentions at all.

5          MR. MCANDREWS:  That's correct, other than confirming

6     that the products purport to comply with the standards that

7     we've read the claims on.

8          THE COURT:  Okay.

9          Well, but the point is, nothing that they provided has

10    been actually cited in any of this.

11         So, essentially -- and you don't have to confirm this

12    is true -- I, essentially, gather you probably mapped all this

13    stuff before ever you brought suit, and then you just handed

14    them what you mapped?

15         MR. MCANDREWS:  True, other than confirming that the

16    products had the standards compliance, we believe when we

17    brought suit, you're correct.

18         THE COURT:  Well, so, when you say, confirming the

19    standards had met compliance, that's where -- that's the reason

20    why I've written up this little hypothetical, because I thought

21    either you were talking past each other, or at least you were --

22    there was -- I wasn't quite getting what the dispute was,

23    because as I understand it -- you know, and I'm approximating

24    here -- you've done what I asked you to do, which is you

25    narrowed it down to no more than 64 claims spread over your 32

1    patents, or at least, since maybe one defendants, or both of

2    them, two of them don't have 32 patents -- but, anyhow, you

3    narrowed the asserted claims down to less than 64.

4         And, so, you have said in, you know, hundreds and

5    thousands of pages, you know, in the first patent, if you

6    complied with some part of some standard, or maybe the whole

7    standard, you would infringe our patent and here's why.

8         And one, two, three, four, five.  And here's a list of

9    products that comply with that standard.

10        MR. MCANDREWS:  That's true.

11        THE COURT:  I mean that's, essentially, what you've

12   done, right?

13        MR. MCANDREWS:  That's correct, your Honor.

14        THE COURT:  And, so, then I see them write back or

15   write -- I guess they went first -- write, well, there's a

16   couple of times where they say they complied, that we complied

17   with the optional standard, but there is no indication as to

18   whether we actually practiced the option.

19        And there's some small number of instances cited when

20   this is the case or supposedly the case.

21        And, so, I guess I'm wondering -- and this is not so

22   much a question for you, but for the defendants -- is this just

23   nitpicking around the edges, because for the things where the

24   standards aren't optional, or the part -- where there aren't

25   options, you know, your contentions are sufficient at this

1    point, remembering they are preliminary.  And partly that's in

2    your letter, you say, everybody knows that their products read

3    on the standard, you know, high-level documents confirm it, and

4    they know that, and there's no real dispute there.

5         But I didn't quite, necessarily, get that from their

6    letter.  I thought maybe they were saying -- well, I don't know

7    what they were saying.

8         So, I guess what I'm trying to figure out is -- and,

9    so, that's part of the reason why I have this little

10    hypothetical, because the case of Fujitsu vs. Netgear, as I

11    understand it, if we had this kind of a standard from some

12    standards setting organization for telling them what that is,

13    and it's got these five things, you know, the first four of

14    which are mandatory, and the fifth of which is just optional,

15    and then you've got multiple patents.

16         Patent one claims the fourth thing, which is mandatory,

17    and Patent 2 claims fifth thing, which is optional.

18         Then -- and what we know about their accused product is

19    if it complies with standard one, you know, we could fool around

20    with exactly what it is supposed to comply with.

21         But let's say it just says, let's say, you know, it's

22    got a seal of some kind that says complies with Standard 1 of

23    the standard setting organization.

24         And, so, it would seem to me, under my understanding of

25    Fujitsu vs. Netgear, taking that fact a step towards the

1    infringement contention stage, that if you say, you know,

2    sufficiently allege, or map, or chart that, essentially,

3    Standard 1.4 -- something meeting Standard 1.4 would infringe

4    your patent, then because that's mandatory.  And, if, in fact,

5    it's either agreed, or there's some other easy way to say, yes,

6    it complies -- it complies with the Standard 14, then it seems

7    to me, you know, you've kind of connected A to B and B to C.

8          On the other hand, what they seem to be arguing about,

9    defendants is that you've got your second patent, which you have

10   said -- and, you know, this is what I'm getting from their

11   letter -- that the Standard 1.5 about the antenna when it's

12   operating between 10 and 20 megahertz, that it infringes your

13   second patent.

14         And they're saying -- and it makes a certain amount of

15   sense to me -- that, well, you can't say that our product

16   infringes because it complies with the standard, and one of the

17   optional parts of the standard reads on your patent.

18         And, to some extent, I got from your letter that you

19   were saying, well, then that's something they can bring up

20   later, but it seems to me actually that if there is actually an

21   optional thing that is something that you actually ought to have

22   something more than just saying, well, that is something that

23   you can bring up later.

24         So that's kind of my understanding of what's going on.

25   Maybe now you all can help me.

1      It would probably be easier for me, if my example is

2   useable for you to argue within those terms, rather than

3   whatever standard actually does apply to your hundreds and

4   thousands of products and your hundreds of patents.

5      So Mr. McAndrews, since you're standing up, do you want

6   to tell me what you think the dispute is here?

7      MR. MCANDREWS:  So, first of all, your example here is

8   perfect to make the point.

9      So it is correct that we have patents that map on what

10  are called Standard Mandatory Sections of the standard.

11     And, so, that would be your rotary dial consisting of

12  ten finger holes in the patent in one example and it would map

13  that way, so that's what we have been done.

14     There are also portions of standard that are on their

15  face described as -- well, not on their face -- but there's

16  various words used in the standard, itself, to let you know

17  whether it is a standard optional feature.

18     And there are, in fact -- they point out one of the

19  patent family's reads on a standard optional feature.

20     And let's just, for the sake of argument, I'm not

21  saying there is only one.  They may say there are others.  But

22  we would acknowledge that there is a standard optional section

23  of the standard that we have mapped the claim to.

24     So, what our position is, is twofold.

25     One, the documents they have provided us to date --

1    well, and there is an exception that happened early this week --

2    but the documents they provided us to date do not tell whether

3    that product implements that standard optional feature on

4    information and belief, which we've pled, on information and

5    belief, we believe that we can prove after an opportunity for

6    discovery, that they infringe that patent, right?

7         But the documents they provided to date, do not tell us

8    whether that standard optional feature is being implemented by

9    the DSL components of the device.

10        So, in part what the defendants told us is, they don't

11   know.  They don't know whether their product implements that

12   standard optional feature.  And we need to go talk to the chip

13   makers.

14        So our position is that we have reached a point where

15   it would be appropriate to open further discovery and allow us

16   to go out and take this third-party discovery.

17        If you recall, your Honor, you limited us to --

18        THE COURT:  Yes, I do recall.

19        MR. MCANDREWS:  -- exchange.  We didn't have that

20   opportunity.

21        The defendants, with a few exceptions, claimed they

22   don't have this information in their possession, and, therefore,

23   we want to have the ability to go out and do that.

24        The second part of this, though, is the defendants

25   claim that they have no ability to move forward in the case.

1            The point is, as you point out in your Example 5 here,

2   I know why you would contend that I infringe that patent.

3            Your Example 5 in your Patent 2 is, "An antenna that

4   operates between 10 and 20 megahertz."

5            They understand that that's my theory of infringement.

6   And if it turns out to be true, based on the information we

7   discovered, then that's my infringement theory going forward.

8            They don't have to guess at what my infringement theory

9   is.  They know what it is.  They might say -- they might say

10  they don't know whether they infringe.

11           But how can they expect me to have that information,

12  other than information and belief, when they, themselves, claim

13  they don't have it and they denied infringement.

14           THE COURT:  All right.

15           That's helpful.

16           Who wants to speak on behalf of defendants here?

17           MR. DAY:  Your Honor, James Day for Zhone.

18           I'll at least begin.  I'll speak for the defendants.

19  If others want to chime in, I would allow them to do that.

20           THE COURT:  All right.

21           Well, I mean they can chime in, because they are not

22  you.

23           MR. DAY:  Fair enough.

24           Well, your Honor, there are a couple of things that I

25  want to touch on.

1          One is, first of all, the idea that we picked out the

2     only optional function from these standards.  Mr. McAndrews

3     referred to the others as all mandatory.  But there is no

4     showing that any of those functions or features of the standards

5     that have been cited are mandatory.  They don't use the word

6     "mandatory" in any of the charts to describe anything.

7          And, in fact, rather than that, in the pleading that

8     covered the claim charts when they sent them to us, the TQDelta

9     said, the claims charts are not intended to indicate that every

10    cited section in the identified industry standards or every

11    requirement of every cited section must be practiced by the

12    product in order for a particular claim to be infringed.

13         They also say the claims charts are not intended to

14    indicate that any claim of the subject patent is necessarily a

15    standard section.

16         So what we're told is, you can't assume any these

17    charts are mapping to mandatory functions within these

18    standards.  They haven't made any showing.  And that's what

19    Fujitsu requires as a threshold, if you are going to try to use

20    the standard as a proxy for the product.

21         So, first of all, it's just --

22         THE COURT:  Well, isn't that kind of just a legal

23    conclusion?

24         I mean if Mr. McAndrews wrote a letter saying, okay,

25    you know, what separates one patent family, we actually think

1    all these things are standard, essential, mandatory, or some

2    phrase like that, which, after all, is pretty much a legal

3    conclusion, isn't it?

4         MR. DAY:  I don't think so, your Honor.

5         The way that you determine that is by looking at the

6    language in the standard and determining whether it says

7    something like, you must do this, or this is a mandatory --

8         THE COURT:  But, I mean -- so, yes, you need some facts

9    to go into this legal conclusion, but it's not -- it's not facts

10   -- it's not something where discovery is going to provide better

11   answers?

12        MR. DAY:  Well, sure your Honor.

13        It would be a step in the right direction if the

14   plaintiff's told us which of these charts they think map onto

15   mandatory features.

16        THE COURT:  So, let's take -- so Mr. McAndrew's said --

17   and I shouldn't characterize what he said -- but the gist that I

18   got from it was, yes, we have mapped some non-mandatory things,

19   although we think they are there.  But most of the things, you

20   know, we don't think are optional.

21        And, in any event, particularly for the things where

22   even the defendants might have trouble figuring out whether, you

23   know, how chips work, we said what our theory is.  And, you

24   know, we'll find out soon enough whether, you know, every one of

25   these theories is good or just, you know, something less than a

1    hundred percent of them were good theories.

2         MR. DAY:  Here's the problem, your Honor, for

3    progressing this case forward.

4         What we have right now are claim charts that map the

5    claim language to a standard, which is sort an abstract

6    statement, a bunch of functions and features.

7         THE COURT:  As opposed to a patent?

8         MR. DAY:  Well, okay, so it's two abstract descriptions

9    of something.

10        There is nothing tying that to actual functions,

11   features, instructions in any of the products that they've

12   accused.

13        THE COURT:  Well, so that's kind of -- you know, it

14   seems to me if you think of this as being like first grade math,

15   you know, A equals B and B equals C, therefore, A equals C, then

16   the part that seems to be -- what I was hazy about from reading

17   the papers, and it seemed to me to be more of your concentration

18   at least, was this B to C part.

19        MR. DAY:  Right.

20        THE COURT:  And, so, I guess what I'm wondering is --

21   so Mr. McAndrews in his letter said something about, you know,

22   product descriptions, both sides think it was not very helpful

23   to annotate the infringement contentions with product

24   descriptions.

25        What is it -- actually, just stand there for a second.

1        Mr. McAndrews, on a particular product, you've got all

2   these listed products, what is it that -- how does something get

3   on the list for a particular standard?

4        MR. MCANDREWS:  So, your Honor, the product will

5   typically have a data sheet, which is a little bit of a

6   glorified product brochure.  It's probably a two-page document.

7   And at the end it will be describe a number of standards,

8   actually by standard number, the ITU uses a standard G dot --

9        THE COURT:  Well, in other words, of a piece of paper

10  that says something about a particular standard, like complies

11  with, or I don't know, is there a formulaic kind of way that

12  they do this, or does it vary from product-to-product or what?

13       MR. MCANDREWS:  It's certainly standard in the way that

14  the letters are written out.

15       G.992.3 is an ADS2 standard, right?  So that would show

16  up.

17       But as far as whether they'll say, complaint with, or

18  uses the standards, or just list standards without any narrative

19  --

20       THE COURT:  Well, if something is compliant with the

21  standard, is that the same thing as uses the standard?

22       MR. MCANDREWS:  We believe so.  We believe so, yes.

23       THE COURT:  What do you say?

24       MR. DAY:  That is the whole point of most -- of many of

25  these features being optional.  That the functionality may be

1    there, but you don't have to use it, or you don't have to

2    provide it at all.

3           So I think it's incorrect to say if you're complaint

4    with a standard, you practice every feature, or even every

5    mandatory feature.  It's sort of capability versus what actually

6    is happening.

7           THE COURT:  Well, capability -- I don't know.  There

8    are 33 patents here.  I imagine we have all kinds of different

9    claims.

10          But if it had the capability, of -- I don't know --

11   two-way communication, and the claim is, has the capability and

12   apparatus has capability of two-way communication, haven't they

13   made some progress?

14          MR. DAY:  I think this is a half step in the right

15   direction, your Honor.

16          And then the second step is to tie either the claims to

17   the products or these standards they've cited to the products,

18   but they maybe illustrate the problem of what we're having, your

19   Honor.

20          First of all, these charts are designated confidential,

21   so I can't give them to my engineers.

22          THE COURT:  We're going to take care of that in a

23   minute.

24          MR. DAY:  Right.  But saying that, if I could sit down

25   with my engineers -- and I have been able to at least discuss

1    with one of our senior executives -- that based on your

2    hypothetical, there is this optional part of the standard that

3    refers to an antenna, and that antenna is operating at a certain

4    frequency.

5         The problem your Honor is, in this hypothetical, we

6    have products either that have no antenna or have multiple

7    antennas.  And we don't know what it is that they might be

8    pointing to, to say, well, there's the one that operates at

9    between 10 and 20 megahertz.

10        So that's the problem.  We have not been informed what

11   feature, function, structure it is that they think is practicing

12   each of these functions that are part of the standards they've

13   identified.

14        THE COURT:  So your problem is not so much, or maybe

15   not at all, really, the mapping from -- or the charting from the

16   patents to the standards.

17        It's the second part?

18        MR. DAY:  Your Honor, I think that some day we're going

19   to dispute some parts of the A to B mapping the claims to the

20   standards, because I disagree with some of those.

21        THE COURT:  Well, that's the reason we have trials at

22   the end for those kinds of disagreements.

23        MR. DAY:  But I agree with you completely that for

24   purposes of today, and where we are right now, the problem we're

25   facing is mapping something, either the claims, or the standard

1   to the actual products, so that my people can look at the

2   product and say, okay, well, this is the part they're accusing

3   of infringement.

4        And the reason we need to know that, your Honor is, as

5   the plaintiff's have suggested, one way to start narrowing this

6   case down is to come up with representative products.  And if

7   you look at their Proposed Scheduling Order, the way they say to

8   do that is to group products that have the same functions,

9   features, or instruction that infringe the claims they've

10  asserted.

11       Well, we don't know what those are, your Honor, because

12  they haven't disclosed those.  Until we know what those are, we

13  really can't begin to group things together and pick out

14  representative products that all have that same, supposedly --

15  excuse me -- supposedly infringing feature or structure that the

16  plaintiffs have suggested.

17       So what we're suggesting is a way to start to narrow

18  the case down.  If they were to provide real infringement

19  contentions that showed either the claim or the standard, but

20  mapped against our actual products, we would be able to go back

21  and say, okay, well, if this is the piece that they're accusing,

22  we know that all of these DSL products have that same piece.

23       THE COURT:  Okay.  So a couple of random questions.

24       First off, in terms of invalidity contentions, what

25  does any of this dispute have with your ability to make them?

1          MR. DAY:  Well, there's two things, your Honor.

2          One is just the sheer number of patents.  We're still

3     looking at 32 patents.

4          THE COURT:  You know, I was trying to cut it down --

5     well, go ahead.

6          MR. DAY:  The sheer number of patent.  Every patent

7     has, potentially, a different priority date.  Implicates,

8     potentially, different prior art.  There are going to be

9     different written description arguments, depending on if it's a

10    parent or a child patent.  There are all sorts of different

11    issues.

12         And, as your Honor knows, if this were a case with

13    three or four patents, there would be a lot of work that would

14    go into invalidity contentions.  It's premature to make us to do

15    that now with 32 patents.

16         And the second way that this relates -- this dispute

17    relates is, I'm confident that if the plaintiffs were to go out

18    and try to map the claims of these patents, or even the

19    standards to our products, I'm confident the whole patent

20    families, not just the patents, but patent families would fall

21    out of this case when realize they can't do that mapping.

22         So I believe firmly that we'd end up with fewer patents

23    in this case just by going through that process.  And that

24    directly relates to the burden on us in putting together

25    invalidity contentions.

1          I also, frankly, think -- I'm positive that if they

2     went through this exercise, a fair number of the products that

3     they're accusing would fall out, because some of the ones that

4     they accuse don't do anything like what the patents talk about.

5          If there is some data sheet saying this product will

6     comply with a standard, but the thing that it does has nothing

7     to do with what these patents are talking about.

8          So I think this one requirement, putting together

9     normal infringement contentions, would narrow the case down to a

10    point where it would be reasonable with invalidity contentions.

11         THE COURT:  So, are you saying, essentially -- and I'm

12    probably overstating the case here -- but these data sheets

13    referencing standards, whatever language they're referencing

14    them, are essentially meaningless?

15         MR. DAY:  I don't think that's right, your Honor.

16         I mean they're certainly important for people who were

17    implementing DSL networks.  We need to know what's going to be

18    able to operate with what and how things can communicate with

19    each other.

20         I think that given where we are in this case, the fact

21    that something says that it complies with these standards, it

22    advances the ball not at all.

23         THE COURT:  Well, so, let's just talk about the

24    practical thing.

25         Mr. McAndrew's says you don't even have the technical

1   -- based on your technical production, you don't have what is

2   necessary for him to be more specific.

3        MR. DAY:  Well, I would love to talk about the

4   documents just a little bit, your Honor, because the notion that

5   we have not produced technical documents is false.

6        From Zhones' perspective, we sent our production out on

7   the 26th as required.

8        On that same day we said, and you're getting these

9   documents from at least Broadcom, which is the company that

10  supplies the chips for many of our products, and we are willing

11  to stipulate that you can go out and take that discovery now,

12  despite the general stay on discovery.  So the notion that

13  they've been prevented from doing that is false.

14       We produced documents that day.

15       I spent the first half of July sending more and more

16  documents to TQDelta, because they asked for them.  I understood

17  they needed them to put together these infringement contentions.

18  They asked for documents.  We gave them to them.

19       The last letter I got asking for anything was on July

20  11th.  I produced what they asked for and I haven't heard a peep

21  since.  So they've got all the documents they asked for.

22       I understood they were going to use those documents.

23  They chose not to.  There is not a single citation to a single

24  document in those 1500 pages to any of the defendants'

25  documents.

1        I don't know if they can glean from our documents what
2   their infringement theory is.  They haven't tried to do it.
3        I do know that to understand completely how the
4   products work, they are going to need some third-party
5   discovery.  We've been prepared to let that move forward, so
6   that they could give us a really infringement contentions for
7   months now, and they've chosen not to do it.
8        THE COURT:  All right.
9        First off, do any of the other defendants have
10  something that you want to add?
11       MR. CONNOLLY:  I think Mr. Day has done a nice job
12  outlining the argument.
13       THE COURT:  All right.
14       Mr. McAndrews?
15       MR. MCANDREWS:  Your Honor, I beg to differ with the
16  recitation of the history of document production.
17       First of all, Zhone chose to make documents available
18  on the website.  And most of the dispute we had with them was
19  trying to figure out how we would manage production of that.
20       If they were saying, just look at our website.  Figure
21  out what you want.  And then put the burden on us to Bates
22  number documents and we're trying to keep track of that.  That's
23  most of what went on with Zhone.
24       As far as offering third-party discovery to us, of
25  course, the Court prevented that, and wanted us to step through

1    these early stages.  We did the best we could with the documents

2    we had.

3           As far as going out and opening up discovery with a

4    company like Broadcom, as an initial matter, we need to know

5    what components of their products are even relevant.

6           I'm not going to go take general discovery of a giant

7    corporation like Broadcom and just say, tell me about your

8    stuff.  Tell me about your DSL stuff.

9           I need to know from their documents, that obviously

10   have to exist.  Then know -- they don't say, assembly plant in

11   Asia.  Give me something that does DSL.

12          That's what I'm hearing from these parties.  They

13   didn't have documents like that.  They don't have a product

14   specification that says it needs to be capable of this, this,

15   and this.

16          It's going to have this bill of materials with these

17   specific chip model numbers in them, right?

18          As recently as last Friday we were in a discussion with

19   one of the parties on that level.  These documents, obviously,

20   exist.

21          For Mr. Day to stand here and say that he is -- he is

22   certain that there are certain of our patent families that don't

23   read on their products, I would like to know how he's certain,

24   because the documents he's given me, don't indicate that.  The

25   documents that he has given me, indicate that the products are

1    compliant with the standard, and don't get down to the level

2    that would be necessary to know whether a standard optional

3    feature is practiced.

4          THE COURT:  Well, you know, in other cases where

5    defendants have thought the patents were being misread by the

6    plaintiffs who accuse some or all of their products, they

7    usually present some sort of a letter or something explaining

8    why your misguided.

9          I take it you haven't gotten that sort of letter?

10          MR. MCANDREWS:  That's correct, your Honor.

11          And, you know, for someone to promise or attest to the

12    fact that they don't infringe isn't, obviously, going to satisfy

13    my client.

14          THE COURT:  No, no, no.

15          MR. MCANDREWS:  Right.

16          THE COURT:  I mean I've seen -- you know, and maybe

17    typically where I've seen this is ones where there is a smaller

18    number of patents issues.  Of course, that's starts with every

19    case I've ever had.  And, you know, more -- there's kind of

20    finite dispute.

21          Part of the thing of having 32 patents, and I have no

22    idea how many accused products is -- using a lot of time

23    chipping off bits and pieces here and there -- and you've still

24    got a huge thing left.

25          And, so, maybe in a sense this isn't different.

1          Anything else?

2          MR. MCANDREWS:  I just wanted to mention one point.

3          You asked the question about -- and actually it was

4    mentioned by Mr. Day -- I referenced that there are some

5    products that are listed.  And this is different than when he

6    said there are patent families that are not infringed.  He

7    mentioned that there are some products listed that he says,

8    while the brochure may say, standard compliant, it isn't.

9          We agree that that happened.  It's an outlier.  It's a

10   less than one percent issue here where an adapter that does not

11   have all of the DSL function that are necessary to be an adapter

12   said that it can -- it said, works with products that are

13   complaint we DSL standards.  That was a mistake.

14         I have to talk to somebody about why that showed up.

15         We already discussed that issue and I said I would be

16   more than happy, if you want to go through the list with me, and

17   point out where that happens.

18         THE COURT:  How many products have you accused,

19   roughly?  Round off to the nearest hundred?

20         MR. MCANDREWS:  It's different for each party.  For

21   2Wire it's the lowest number.  They tend to standardize on a

22   model name and sticker for a while.

23         For the other parties, there is a much larger number,

24   but if you dig down into it, it's a really more manageable

25   number.

1          THE COURT:  Give me the larger number?

2          MR. MCANDREWS:  A larger number is --

3          THE COURT:  Ballpark.

4          MR. MCANDREWS:  Ballpark.  200.

5          THE COURT:  For Zhone.

6          MR. MCANDREWS:  For Zhone, for example.

7          THE COURT:  And for 2Wire, which is, I guess, at the

8   low end is what?

9          MR. MCANDREWS:  Less than 30.

10         THE COURT:  Go ahead.

11         MR. MCANDREWS:  But the two hundred, if you dig down a

12  little deeper, it's actually a product series.  Actually, the

13  defendants, some of them have cited a case to us.  There's a

14  Court in California where a party had identified accused

15  products by family, by series, and the Court determined that

16  that was not sufficient.

17         So what we did, we did to the best of our ability, was

18  to list out every suffix to the enth degree of, you know, maybe

19  it has 16 ports, or 32 ports, or it has a different power supply

20  than the other one.

21         Not really relevant to the infringement issue, but we

22  wanted to make sure that we had as many model numbers as we

23  could possibly list.  If we could back it up to a series,

24  though, we would have a more manageable number.

25         THE COURT:  All right.

1            So I think Mr. Day said that some of these standards,

2     it's hard to tell whether they're mandatory or not mandatory.

3            What do you think about that?

4            MR. MCANDREWS:  Well, I think he may have been mixing

5     two issues.

6            So one was whether the patent is a standard essential

7     patent.  And I think that what they're trying to do is force

8     some sort of admission out of us that a patent standard is

9     essential.

10            In the Innovatio case, Judge Holderman determined that

11     that was a -- that the burden of proof fell on the defendants

12     for establishing something that is standard essential.

13            Now, simply the fact that a claim reads on an optional,

14     and actually the analysis doesn't matter whether it is optional,

15     standard optional, or whether it's an option spelled out in the

16     standard.  So, as far as standard essentiality goes, it doesn't

17     matter whether it's a standard optional or a standard mandatory

18     portion of the standard.

19            What does matter, though, is a different issue than I

20     think is presented by these initial claim charts though is,

21     whether there is an alternative that was available that the

22     parties can, essentially, comply with the standard without

23     infringing the claim.

24            Which is a slightly nuanced different issue.  It does

25     matter in certain circumstances that -- I don't think this is

1       the -- I mean I could try to describe them to you, but --

2               THE COURT:  But I mean, you know, I can imagine you say

3       something has to be 10 megahertz, or 20 megahertz, and may be,

4       even though I would have thought your mapping to the standards

5       would take care of that issue.

6               I mean, after all we're saying, or I'm saying mapping

7       to the standard, you know, we're talking about -- we're talking

8       about preliminary contentions here.  You know, a hundred percent

9       accuracy is nice, but there is a reason why they're preliminary.

10              And we don't have -- whether you use it or not -- you

11      don't have a lot of technical information.  So, the fact that

12      there can be sort of points of dispute, you know, I think that's

13      very much in your favor at this point, because we are trying to

14      get the ball rolling.

15              And, so, I'm not too concerned about that.

16              But I guess one of the things that Mr. Day said was

17      that it wasn't so clear a lot of times, when there is a

18      standard -- I mean I guess if you can map a patent to what the

19      standard says, depending on how that is going, maybe you're

20      saying in it, well, here we think the standard says or

21      requires...

22              Okay.  Let me skip that thought, because I'm not making

23      any progress there.

24              So, on the second side, these data sheets things,

25      something's complaint with, or complies with, what does that

1     mean?

2              MR. MCANDREWS:  What does it mean?

3              THE COURT:  Right.

4              MR. MCANDREWS:  Well, it would mean at a minimum that

5     the product practices the mandatory portions of the standards.

6     It also means that it is more likely than not that the practice

7     is an optional portion, particularly on information and belief

8     that it's known that that an option that most parties use.

9              THE COURT:  All right.

10             One side or the other said they were going to bring

11    some infringement contention to show me, because, apparently --

12    because the letters -- I actually appreciate letters that don't

13    have thousands of pages attached to them -- but because the

14    letters, I don't know, weren't sufficiently crystalizing

15    actually what the dispute was here.

16             So, I take it, I think it was Mr. Farnan's letter that

17    said you would bring something?

18             MR. MCANDREWS:  Yes, your Honor.

19             I just brought a sample here.  Of course, I didn't want

20    to bring 1500 pages.  These happen to be charts that our -- that

21    were meant 2Wire.

22             THE COURT:  Okay.

23             MR. DAY:  Your Honor, we brought the charts that are

24    cited in our letter.  May we also hand those up?

25             THE COURT:  Well, why don't you -- I'm trying to avoid

1    getting too many sets of charts here.

2         Why don't we start -- Mr. McAndrews, what you have, is

3    that cited in the letter somewhere or is that something that

4    there has been no reference to?

5         MR. MCANDREWS:  It was only a reference.  We did not --

6    we do not know exactly what would be provided to the Court.

7         I can read into the records what this is, though.

8         THE COURT:  Well, let me just start, because this maybe

9    a poor direction to follow, but Mr. Day, why do want you give me

10   what you did actually cite in your letter.

11        MR. DAY:  Your Honor, we cited multiple charts for two

12   different points.  This is one example of each of two points.

13   It's two charts.

14        THE COURT:  All right.

15        And which --

16        MR. DAY:  For Zhone, it was No. 53 and No. 30.

17        THE COURT:  All right.

18        MR. DAY:  There is some difference in numbering between

19   the parties.

20        THE COURT:  All right.

21        So Claim Chart 30.

22        (Pause)

23        MR. MCANDREWS:  Your Honor, if I could point out that

24   those charts are missing the cover page.  And I don't think that

25   was their intent to indicate that there is no reference to

1    products in our charts.  But there is a cover document that goes

2    with those charts that explains which products the charts apply

3    to.

4              THE COURT:  Right.  I remember seeing your letter

5    saying something like that.

6              So, there is a page that says this applies to -- I

7    mean, there is some other page which says what products are

8    covered by this claim, right?

9              MR. DAY:  Correct, your Honor.  There is a chart that

10   has a list on the left with a bunch of products on the right.

11   It says --

12             THE COURT:  Claim Chart 30.

13             MR. DAY:  -- Chart 30 shows how we infringe.

14             THE COURT:  Okay.

15             (Pause)

16             THE COURT:  Okay.  By the way, in your two letters, I

17   saw the -- obviously, the Fujitsu/Netgear case.

18             Did either of you actually cited a case that -- so both

19   of you were reasoning from that as to what is required in an

20   infringement contentions -- did either one of you cite something

21   that was actually dealing with infringement contentions and the

22   standard?

23             MR. MCANDREWS:  No, your Honor, we did not.  We

24   couldn't find anything at that level.

25             MR. DAY:  No, your Honor.

1          THE COURT:  Okay.  Just hoping here.

2          MR. DAY:  Your Honor, may I offer some more thoughts on

3     the charts?

4          THE COURT:  Yes, but let me just look at it first.

5          (Pause)

6          All right.

7          Mr. Day, what are your thoughts about Chart 30?

8          MR. DAY:  Well, your Honor, Chart 30 is just an

9     example.  We cited it because the footnote on the first page

10    makes it's clear that this is an optional function.

11         It says in the footnote that the standard does not

12    require a standard compliant device, et cetera, et cetera.

13         But the problem, your Honor, if you look at the chart,

14    the standards are stated -- and, again, as I said earlier in

15    abstract terms, they are not concrete functions that are easily,

16    or certainly is not easily mapped to an actual product.

17         The problem is, it's the implementations of the

18    standard that is really accused here, your Honor, but we don't

19    know what that is that they are accusing.

20         And I think one of the things that provides -- and Mr.

21    McAndrews talked about -- illustrates this problem.  It gets

22    back to your question about what the data sheets mean.

23         The patent talks about things that happened at what's

24    called the Central Office.  So that's at AT&T over here, and

25    then things that happen in the modem in your house.  That's the

1    consumer premises equipment, and that's way over here.

2         Well, they also accuse some things.  They listed some

3    things that sort of sit in the middle.  They'll do anything that

4    is stated in the patents.  But it's complaint with the standard,

5    because this thing that goes in the middle, it's called a

6    splitter, one example works in a system that allows

7    communications, DSL communications consistent with the standard.

8         So, the standard has hundreds, maybe thousands of

9    different functions and features, but just because something is

10   complaint with that standard can be used in a network that

11   complies with that standard, doesn't mean it necessarily

12   practices any one those particular features.

13        It could be, like this product, something that just

14   sits in the middle, and it splits your telephone line off in one

15   direction and splits your DSL line off in another direction.

16        If we had infringement contentions that tried to map to

17   that product -- first of all, it sounds like that product --

18   those splitters are going to go away, as I suggested earlier.

19        But I think if they went through this exercise, other

20   products would also fall out.  But I think the bigger advantage

21   of getting clarity on what it is they're accusing is that then

22   we would have some ability to group these products based on the

23   accused functions, features, structures, once we know what those

24   things are.

25        And, your Honor, there is another point I wanted to try

1    to make using your hypothetical, if you would indulge me just a

2    moment?

3            THE COURT:  Sure.

4            MR. DAY:  Here's the problem.

5            Mr. McAndrews is suggesting that the part of the

6    standard that talks about dial is the rotary dial is mandatory.

7            Let's assume that's true.

8            The problem is, the standards are often stated in sort

9    of functional terms, or this is the way it needs to work, but

10   the doesn't tell you how to implement it.  It doesn't say what

11   you need to do to make that thing happen.

12           So, imagine for a minute that No. 4 in the standard

13   said, you need to have a method for dialing.  It's similar to

14   what you have here.  That's the way the standards actually

15   describe things.  You have to have some way to dial.  And the

16   patent said, you need a phone with a rotary dial with ten finger

17   holes.

18           Just because you comply with the standard, even if that

19   was a mandatory part of the standard that you have something

20   that dials, that doesn't mean that you have a rotary dial with

21   ten finger holes.

22           The problem that we have here, your Honor is, if you

23   just map on to the standard, we don't know what it is that they

24   think to the rotary dial on our phones.  I mean this is a very

25   simplified example.

1          When you look at the chart in front of you, and the

2     discussion on the right-hand side, it's incredibly technical

3     stuff, stated in terms like I just used, and it's not at all

4     clear what it is that they think what functions, features,

5     structures in our products are meeting those parts of the

6     standards that they've cited.

7          And, ultimately, it's their burden.  This is their

8     lawsuit.  They want to have a patent infringement lawsuit.  And,

9     at a minimum, they ought to be telling us what it is about our

10    products that they think infringe before we have to go out and

11    do invalidity contentions based on really no understanding of

12    what they think the scope of these patents are with regard to

13    our products.

14         THE COURT:  So, just carrying the telephone example, or

15    maybe restating sort of what you just said, if the standard said

16    you need a method for dialing a number, and the patent claims a

17    rotary dial, and then you say the standard reads on the rotary

18    dial, that's a method for dialing a number.

19         So what you're saying is, you could have a push button

20    phone system that would also read on the standard and yet it

21    would not read on the patent?

22         MR. DAY:  That's right.  We certainly would say it

23    would not.

24         But perhaps the plaintiff would disagree, and we'll

25    never know that there is that dispute until they tell us what it

1          is about our products that they think is --

2                    THE COURT:   And, so, going on to the Netgear and

3          Fujitsu, when they're talking about when you're going to do this

4          kind of analysis, you have to cover all the possibilities that's

5          -- that would be what you're telling me, that's how I connect

6          those two things up?

7                    MR. DAY:   That's the point.

8                    Fujitsu says, look, if you want to use a standard as a

9          proxy for a product, you've got to show that that part of the

10         standard is mandatory, and that every way you can meet that

11         standard infringes the patent.

12                   If you do that, okay, fine, we'll let you use this

13         short cut.  If you can't, then you haven't connected the logical

14         up.  You haven't shown what my product does with it.

15                   And that's what we have here, your Honor.

16                   THE COURT:   Okay.  I understand that point at least for

17         a minute.

18                   Let me hear from Mr. McAndrews before I forget.

19                   What do you think about that?

20                   MR. MCANDREWS:   Well, I think what he's talking about,

21         if he's talking about at the infringement proof stage of the

22         case --

23                   THE COURT:   Well, let's talk about what the stages are.

24                   In terms of what is Netgear was talking about, is that

25         a fair characterization?  Is that a fair example, I guess?

1          MR. MCANDREWS:  I don't think so.

2          So, in _Fujitsu_ what they were talking about is that

3    there are standard mandatories.  What Mr. Day is suggesting is

4    that we've got claims that we've read on the standard mandatory

5    section.  He's suggesting that somehow we're wrong.

6          I suppose he's saying that, right?

7          He is entitled to say I'm wrong about that.  It's not

8    because he doesn't know what my contention is.

9          THE COURT:  I guess what he's saying is somebody --

10    let's say there are three ways to practice the standard.

11          And you claim in your patent, or the patent claims, one

12    of those three ways.

13          Hold on a minute.

14          (Pause)

15          You said you didn't agree.

16          Go ahead, speak some more.

17          MR. MCANDREWS:  Going back to _Fujitsu_ just briefly, so

18    that the point of _Fujitsu_ is it's at the infringement proof

19    stage.  In fact, it's determining whether a party can satisfy

20    its burden by coming forward at the time of Summary Judgment.

21          And what the Court suggests is that when you read a

22    claim on a standard where the product purports to be standard

23    complaint, that that can satisfy your burden at the stage of

24    Summary Judgment.  And it would then flip the burden of

25    production back on the defendant to come forward.

1       And the quote continues.  So after the quote it says,

2   "Reading on the standard is the same as comparing the claims to

3   the accused product."

4       It goes on to explain in the same paragraph that "An

5   accused infringer is free to either prove that the claims do not

6   cover all the implementations of the standard or prove that it

7   does not practice the standard."

8       They're free to do that.  They're free to provide that

9   information to us.

10      If we have interrogatories available, if we can take

11  the third-party discovery that they think we need, if we can

12  continue with discovery on their documents and their engineers,

13  we can learn these things.

14      Now, moving to the related issue, it's not as gray as

15  Mr. Day would suggest.  It's not the standard that says, well,

16  you might do it, and you figure out a way to come up with it.

17      These standard have to be very precise.  And the reason

18  for that is you have a party like Zhone who keeps its

19  information highly confidential and doesn't share it 2Wire.

20      And yet when you have a Zhone CO product at AT&T, and

21  you have a customer with two-wire modem in their home, it has to

22  work.  It isn't up for grabs.  You guys figure out a way to do

23  it and then we'll troubleshoot after the fact.

24      These products have to be installed and work, all

25  right?

1       I have broadband problem at my house I'm not happy

2    about.  I figure when that thing shows up and they plug it in,

3    that thing is going to work.

4       And that's what standards compliance is about.  It's

5    very precise.  It's not gray as Mr. Day suggests.  It's very

6    precise.

7       So, let me use an example from the chart that they've

8    provided.  This is on Page 2 of 9 of Claim Chart 30 that he

9    provided.

10       And I'll acknowledge that this is in one of our charts

11    where we've acknowledged in the footnote up front that this is

12    something that might or might not be implemented by their

13    product.

14       Let me clarify what I mean by that.

15       So this claim has multiple elements.  And the multiple

16    elements of the claim let's say the first three elements address

17    how the central office equipment is going to communicate with

18    the CPE.

19       And it says, you must exchange these messages, okay?

20       And that based on that exchange -- that is absolutely

21    mandatory, not optional -- based on that exchange, the CPE

22    device, for example, might use the information it learned and it

23    might share its memory or it might not.

24       That's implementation specific that -- by defendant,

25    right?

1        But the first part of this is absolutely mandatory.

2        The reason we have this footnote, though, is it's not

3    the full story.  You've got this additional element of the

4    claim.  I'm going to use the information that had to be

5    exchanged, and I'm going to do this with -- I might ignore those

6    messages and not do it, but I have to exchange this information.

7        So, one of the things that has to be exchanged, and it

8    is spelled out in a great level of detail in the standard, and

9    our claim maps directly to what's going on there is,

10   "transmitting by a transceiver a message during initialization"

11   -- and this O-PMS message happens during initialization --

12   "specifying a maximum number of bytes of memory that are

13   available to be allocated to a de-interleaver.

14       "The O-PMS message conveys" -- and I'm on the

15   right-hand side now -- "The O-PMS message conveys the initial

16   PMS-TC parameter settings that shall be used in the upstream

17   direction during Showtime.  It also specifies the portion of the

18   shared interleaver memory that the VTU-R can use to

19   de-interleave the downstream data stream."

20       This is a message that goes out.  This isn't something

21   that happens inside the device, and nobody else in the universe

22   cares about this.  This is a message that is being transmitted

23   to a foreign piece of equipment.  And the only hope that they

24   have for communicating with each over, in practicing the

25   standard, is that they both recognize that message.  That it's a

1    according to the standard.  So it's nowhere near as gray as Mr.

2    Day would suggest.

3          And to the extent that there is any level of grayness

4    here, that's why we need to move forward with discovery.  They

5    want to put the breaks on now and I have yet to hear from him

6    exactly what it is that he needs.

7          What additional detail does he not have?

8          He keeps saying methods to my product, and he's saying,

9    show me what part of my product does it.

10         If he's saying he wants me to say what happens in your

11   DSL chip sets, it happens in hardware, or it's a software thing

12   that is loaded.  If he wants me to say that, your Honor, I don't

13   have sufficient information to do that yet, because they haven't

14   provided it yet.

15         THE COURT:  All right.

16         I think I have a sense of what I'd like to do here.

17         I'm going -- what I'd like to do is, I'd like to

18   actually get the infringement part of this case moving, and

19   partly in the hope that it will actually narrow down what is

20   actually at issue.  It might.  It might not.  I don't know.

21         The main argument I hear from Mr. Day is that this is a

22   ridiculous amount of effort to go and to try and say why 32

23   patents are invalid.  And there is a certain amount of

24   believability in that statement.

25         So what I'm inclined to do is to sort of stage this,

1    which is, I'm going to put off the invalidity contentions being

2    due until some time in the future, once we further streamline

3    what's going on in the infringement side.

4         And, in terms of the infringement side, you know, I

5    think that the plaintiff has done enough, in terms of

6    infringement contentions, to go forward with discovery and, you

7    know, working on getting whatever other technical specifications

8    the defendants are going to actually produce themselves, that

9    the plaintiff has said it has sort of put forth what it says its

10   infringement theories are, and you go out and get the technical

11   specifications.

12        And these promises -- not promises -- but these

13   representations -- not even that -- but the suggestion that the

14   defendants think that parts of this case will fall away, you can

15   work on that and find out whether it is true or not.  I mean, in

16   the end -- well, I don't want to say anything about what in the

17   end.

18        So, in any event, that's what I'm thinking of doing.

19   I'm not actually sure how to do -- so, if that's what I said to

20   do, what would be the next thing that you all would be doing

21   about infringement?

22        MR. DAY:  I'm sorry, your Honor.  I missed your

23   question.

24        THE COURT:  Okay.  I said, if that's what I did, what

25   would be the next thing that you all would be doing about

1    infringement?

2           MR. MCANDREWS:  Well, your Honor, we would serve

3    discovery requests and interrogatories.

4           One of the things we would do is, we would ask them to

5    categorize the chips that you are in their product, to the

6    extent that they think we need to go out and get third-party

7    discovery.  And we need to have them to identify chips for us

8    first, and, so, we know who to go ask and about what.

9           We would ask them to possibly submit interrogatories to

10   have them pinpoint documents to us that show where certain

11   features are implemented.  We'd be looking for additional

12   documents.  We'd take some depositions of their engineers to

13   determine how these products are put together, and what their

14   engineers know about documentation, and where we might find

15   relevant documentation.

16          So, we'd move forward that fashion.

17          As far as -- and I understand, your Honor, I don't want

18   to argue with you over whether we put off invalidity contentions

19   -- but I believe that we're going to reach a stage where things

20   can't be narrowed any further, because we --

21          THE COURT:  Well, no, no.  I'm sure we are.

22          I don't doubt what you're saying.

23          MR. MCANDREWS:  Right.  So we are going to reach a

24   stage where we do claim construction.  And we can't do the claim

25   construction until we know what terms are important.

1            THE COURT:  For sure.

2            MR. MCANDREWS:  And let me just mention on the issue of

3       burden, I haven't had a chance to respond to that.

4            I understand what Mr. Day is saying, that there's a

5       burden whether there are 32 patents that they need to address.

6            But the truth of the matter is, when you look at an

7       individual patent family -- and I think there is potentially

8       nine for the parties that have 32 patents asserted against them

9       -- I think there are nine families.  For 2Wire there is only

10      seven families.

11           The truth of the matter is that since we've limited it

12      to fewer than an average of two per patent, and there is

13      significant amount of overlap between the claims across these

14      patent families, we're not really not talking about the burden

15      of 32 patents.  You know, the initial step was to limit

16      ourselves to less than two per.

17           THE COURT:  Right, I remember.

18           MR. MCANDREWS:  And then there is a substantial amount

19      of overlap when you have a family.

20           So, when they try to go out and find the prior art,

21      it's not like you need -- if you have a family of five patents,

22      you don't need to have five separate, you know, searches done,

23      right?

24           You're searching that family of patents.

25           THE COURT:  I hear what you're saying.

1          Mr. Day?

2          MR. DAY:  Your Honor, what we would suggest -- and on

3    the invalidity contentions, I'm not going to address it, because

4    I agree with you, your Honor.

5          THE COURT:  You agree with me.  That's pretty funny.

6          MR. DAY:  Assume that I have no objections to your

7    suggestion.

8          On the infringement side, what I would suggest is,

9    we've already -- Zhone has already produced bills of materials

10   for all these products, and told them which chip makers they

11   need to go talk to.  If they want to send an interrogatory

12   asking for what I've already given them, I think it's a waste --

13         THE COURT:  Well, let's not argue.  That's too much

14   detail, because Mr. McAndrews, what he said originally about --

15   before he starts going off on to third-party discovery, he needs

16   to know what he's looking for.

17         MR. DAY:  Well, that's a problem then, your Honor,

18   because that reverses what really needs to happen.

19         Most of the DSL functionality is going to be found in

20   these chips that none of our clients make.  They buy those from

21   third parties.

22         What needs to happen is, the plaintiff need to go to

23   take to those chip makers and figure out --

24         THE COURT:  Well, actually, I don't know whether this

25   is what you've already produced on are not, but I think when Mr.

1    McAndrews' said that you don't just buy chips like I buy AA

2    batteries, that you, you know, have some specifications.  And

3    what you may or may not have produced already, I mean certainly,

4    you know, if he wants to find out whether your contract with

5    Broadcom requires you to do, or requires them to do, or, you

6    know, something to that effect.  What you're engineers tell

7    their engineers.  You know, that seems to me the logical -- a

8    logical way to do it.

9           MR. DAY:  Your Honor, so I think we've already given

10   them that from Zhone.

11          THE COURT:  Okay.

12          MR. DAY:  So I --

13          THE COURT:  Exactly where we are in this process right

14   now, we're not going to figure that out today.

15          MR. DAY:  But let me jump to the point that I want to

16   make, which is, it's not time for generally discovery in this

17   case.

18          THE COURT:  What do you mean by "general discovery"?

19          MR. DAY:  Damages discovery, taking a bunch of

20   depositions, e-mails from all of our engineers.

21          I think if we're going to focus on infringement, what

22   we need to do next is, if they don't think they've gotten our

23   technical documents, tell us what they don't think they have,

24   and we can work on that.  That's something that we can give they

25   them.  Technical documents describing these functions.

1          What really needs to happen next is, they need to go to

2     these chip makers and figure out what it is that they think

3     infringes, because that's the only way we're going to be able to

4     join the issue here.

5          They're going to say to us, well, here's how the chip

6     -- here's the part of the chip that does what we think

7     infringes.

8          How do you invoke that function, okay?

9          Now I know understand what they're talking about.  Now

10    I can go to my people and say, this is what it is they're

11    talking about.

12         So what I would propose to focus on infringement.  And

13    what we should do is complete the production of any, you know,

14    further core-technical documents and do the third-party

15    discovery that's necessary.  Then let's get to infringement.

16         THE COURT:  Well, so, a couple things about that.

17         One is, of course, I don't know what Mr. McAndrews has

18    in mind in doing that.  But part of this narrowing might

19    actually involve figuring out which of your products are most

20    worthwhile to the case.

21         I wouldn't think it was, you know, at a general level,

22    if he wants to find out something about the sales of these

23    products now, that's fine by me.

24         What was the other thing you didn't want him doing?

25    Checking the e-mails.

1          MR. DAY:  E-mail discovery.  It's the really burdensome

2     parts.

3          THE COURT:  Well, e-mail discovery does seem like, you

4     know, unless your engineers and writing all their specs and

5     e-mails, then we're never getting anywhere else.

6          I mean, I don't know if I recognize if I see it, but I

7     think you all would recognize when there's been a reasonable

8     production on your part to materials that tell him what he needs

9     to do.

10          So, for example, you know, let's say you buy Broadcom

11     Chip No. 1 in large quantities for putting into all the products

12     he's accused.

13          Well, then I don't know.  Maybe he already knows that.

14     I don't know.

15          But if he doesn't know that, then going down and trying

16     to chase from Broadcom what the details about Chip No. 1 is, you

17     know, is sensible.  He's not sure whether you're using Chip No.

18     1, or Chip No. 2, or Chip No. 3 in Broadcom, and Broadcom at

19     this point is, you know, is not a good use of his client's

20     resources.

21          MR. DAY:  Yes.  So that's what I'm suggesting, your

22     Honor is, we tell them what -- what is goes our products.  As I

23     said, we've given them the bills of materials.  We can do that.

24          Here are the chips we used for Broadcom and other

25     companies.  Then they can go and talk -- take discovery from

1     those folks and figure out what this case is about.

2          And that's the point when I think they can expand their

3     discovery to -- to us to try to -- because then they can tell us

4     what the functions are that they're accusing.

5          I mean that's the problem.

6          What I'm suggesting is, we stage this to do the

7     third-party discovery, get to a point where we know what it is

8     that they're talking about.

9          THE COURT:  Actually, kind of what I have in mind --

10    well -- I'm sorry --

11         MR. DAY:  Obviously, we need to give them enough

12    information to allow that first stage.  I'm not suggesting that

13    they go out blindly and talk to every chip maker.

14         What I'm suggesting is that we take an incremental step

15    forward, which is, we provide whatever information they need to

16    go out and figure out what chips they need to take discovery on,

17    and then they do it.  And once they have done that, then they

18    come back and tell us what this case is about, you know, how it

19    is that they think our products infringe.  Then it would make

20    sense to go on to, you know, we provide them with interrogatory

21    responses, and engineers for depositions, and that sort of

22    thing.

23         But if we move directly to that, while we're still in

24    the dark about what their theories are, it's an unfair position

25    for us to be in.

1          THE COURT:  All right.

2          Mr. McAndrews?

3          MR. MCANDREWS:  Let me go backwards and start with what

4     he said last.

5          He said that he is in the dark about what our theories

6     are, right?

7          He keeps saying this.  He keeps suggesting that they

8     don't know.

9          And he says, it could be this, it could be that.

10         We've had this discussion on the phone.  He hasn't come

11    up with one single example where he says, it could be, and then

12    he actually uses a word other than this, right?

13         Other than a pronoun.  He uses an actual word or a noun

14    to refer to something in his product, right?

15         THE COURT:  Okay.

16         MR. MCANDREWS:  They know what our infringement

17    contentions are.  Let's not misstate that.  They know exactly

18    why or not that their products infringe.

19         It could be pled otherwise, if they didn't know that,

20    right?

21         As far as the staging of discovery that he's suggested,

22    so what we've seen in the last week, your Honor, are documents

23    showing up for some of the parties.  It is not uniformly true.

24         And Mr. Day may not be aware of some of this, but we

25    are literally getting documents that have a matrix that says

1    "standards compliance matrix."  And it's not at the G.992 level

2    or whatever it is.  It's at the -- this is the specific clause

3    of the standard, is our product that we are requiring our chip

4    maker, we are requiring him to make sure that his product works

5    this way, right?

6         We are getting things like that.  We are getting

7    documents that indicate to us that the information will not be

8    in the hands of the chip maker.

9         Well, these documents are confirming that the

10   information is in the hands of the defendants, but then they're

11   suggesting that there may be some information in the hands of

12   the clip maker.

13        The other types of documents we're getting, or types of

14   indications on these documents are, it will list a standard

15   section and then it will say HW.

16        And what that means is that the hardware they're going

17   to receive from chip maker is capable of doing that, but their

18   software load that they do -- not the chip maker, what they

19   do -- will implement that feature or not.

20        So to suggest that we're going to do this in stages and

21   getting anywhere, if you limit me to going out and trying to get

22   third-party discovery through subpoenas of third parties, we're

23   not going to move along.

24        THE COURT:  Okay.  I'm sympathetic to what you're

25   saying here, Mr. McAndrews.

1        And, so, basically what I have in mind is, you know,

2    I'm trying to create the right incentives here, but,

3    essentially, you conduct infringement discovery however you

4    think best.  You know what you need.  I think you know what you

5    need.  And I think you would be the best one to figure out how

6    to get there.

7        So I'm not going to say do stages like this and stages

8    like that.  You use your good judgment on what you want to do

9    first, second, third, et cetera.

10       But I do think that at some point -- and I don't have a

11   particular date in mind here that you are going to have to, I

12   think, do something more than you've done already with the

13   infringement contentions.  I mean I thought you said this in

14   your letter.  You're actually going to have to --- I mean I

15   think the infringement contentions in the end -- I'm not

16   actually a hundred percent sure as I sit here that Netgear was

17   shifting the burden of proof on infringement here, which is what

18   you seem to suggest, and it strikes me that's hard to believe

19   that that's actually what they said.

20       MR. MCANDREWS:  I would suggest the burden of

21   production at the Summary Judgment stage.

22       THE COURT:  All right.  All right.

23       Fair enough.  You did say that.  You know, I was

24   thinking at the end of the road here it's your burden.

25       MR. MCANDREWS:  Of course it is.

1          THE COURT:  But yet at the Summary Judgment stage, I

2    think -- actually, that sounds exactly what they said.

3          So I guess maybe -- do we need to have some kind of --

4    you know, the positions in the Proposed Scheduling Order that

5    had limits on things like admissions, and interrogatories, and

6    depositions, and, of course, I don't have anything from the

7    defendants on this -- is there any reason why we can't just

8    impose those as the limits that we have in this case, and sort

9    of get moving on that then?

10          MR. DAY:  Well, your Honor, you do have our position on

11    those from the Scheduling Order we submitted in the spring,

12    which is the only -- that's one we put in our position on all

13    those types of things, and we think it's appropriate to do that

14    again.

15          THE COURT:  Can you send me a letter now saying that

16    you were relying on that?

17          MR. DAY:  Yes.  I think our letter said that it was

18    appropriate that this wasn't the appropriate time.  If I'm

19    misremembering that, I apologize, but we talked about this, and

20    I believe it made it in one of our letters that we didn't think

21    it was appropriate to --

22          THE COURT:  Well, no, no.  I saw that you objected to

23    their proposed Scheduling Order here.  Now I'm just asking, did

24    you tell me -- did you go back to March, or whenever we met

25    before, that's what we'd like?

1          MR. CONNOLLY:  I don't think we did, your Honor, but

2     we're not going to change our position on what we've already

3     submitted to the Court.

4          THE COURT:  No, no.  It's just a question of me trying

5     to get prepared here.  You know, I don't go fishing through the

6     record looking for -- well, in any event, okay.

7          Okay.  Well, it's not very helpful, because if I've got

8     one document that I've read, and another document that I haven't

9     read, and I obviously don't remember.

10          MR. DAY:  Also, this document has things that you're

11     not adopting today, your Honor.

12          THE COURT:  Well, no, no, no.  That's right.  That's

13     the reason why we're saying -- we're, essentially, picking bits

14     and pieces that would be necessary for going forward on

15     discovery.

16          MR. CONNOLLY:  Your Honor, may I suggest that in terms

17     of the numbers of admissions, interrogatories, those types of

18     things, I think we're all agreed to.

19          THE COURT:  Okay.

20          MR. CONNOLLY:  And I understand the Court.  And,

21     certainly, we expect that there will be some kind of order that

22     will say, plaintiff's can proceed with infringement discovery.

23     If plaintiffs wants to allocate all of its admissions to

24     infringement discovery, that would be plaintiff's choice.  I

25     don't think we need to limit the --

1            THE COURT:  No, no, no.  That's what I was going to do

2     with   the numbers that you agreed on.  If, in fact, what

3     you're telling me is that most of this was agreed on before, as

4     to what the total numbers are, we'll set the overall numbers

5     now, but we're only going to do the infringement part.  But when

6     the invalidity part comes, that will go against these numbers.

7            MR. CONNOLLY:  Exactly.

8            MR. MCANDREWS:  Your Honor, it's actually not true.

9     The parties did not agree on the number of interrogatories, the

10    number of deposition hours.

11           It was an issue of not being balanced, right?

12           They wanted more, because there is one of us, and we

13    wanted to keep the burden similar between the groups of parties.

14    So there is a substantial disagreement there.

15           THE COURT:  Why don't we do this, Mr. Connolly.

16           MR. CONNOLLY:  I apologize.

17           MR. DORSNEY:  We have your guidance that you want to

18    impose limits on interrogatories and admissions.

19           Can we meet-and-confer and --

20           THE COURT:  Well, Mr. Dorsney, you're a brilliant man,

21    because that's what I was going to suggest.  That you see if you

22    can't come up with some order.

23           And the main thing is that I think we would need to

24    have another status conference in January or so to see how

25    things are going, to see whether we're getting to the point

1    where we either really cannot narrow anything down, and we need

2    to go with invalidity contentions, or whether we are narrowing

3    things down, and then we can go with invalidity contentions, and

4    get the rest of the case moving along, too.

5              I hate to put you on the spot here.

6              Is what I've said been intelligible enough so that you

7    think you can do this or have I left too much up in the air with

8    half-finished sentences and the like?

9              MR. MCANDREWS:  I understand your guidance, your Honor.

10             THE COURT:  Are you okay, Mr. Day?

11             MR. DAY:  Yes.  And I assume the next step is, we will

12   meet-and-confer over a proposed order.

13             THE COURT:  And submit it.

14             MR. DAY:  And submit that.

15             THE COURT:  And if there is disagreements over the

16   number -- some number where it's sort of a binary choice, just

17   put the disagreement in and I will pick one.

18             MR. DAY:  Yes.

19             MR. MCANDREWS:  Your Honor, I don't want to take up too

20   much more of your time --

21             THE COURT:  No, no, no.  That's all right.

22             MR. MCANDREWS:  -- just I wanted to mention two things.

23             One, the deposition limit may be an issue for us,

24   because if we're limited to discovery on infringement issues,

25   technical issues related to their products, some of these

1    parties will likely have witnesses that wear multiple hats.

2    They maybe the guy that is out there marketing the products, as

3    well as the guy that knows their products best from a feature

4    perspective.

5         So, if we take his deposition related to infringement

6    issues, later on we may need from, you know, the marketing

7    what's the important features perspective, and we maybe need the

8    guy from their accounting perspective.

9         So that's one issue.

10        And then the other issue, your Honor, as you mentioned,

11   it will be useful to have sales by unit, revenue, location,

12   location of manufacturer, for example, and location of sale.

13        And I'm not intending to limit myself in these

14   categories, but as you pointed out, we may need to understand

15   what the important products to pursue.  It doesn't make sense

16   for us --

17        THE COURT:  I'm perfectly with you on that.

18        MR. MCANDREWS:  Yes.  We don't need Product 275, if

19   they sold half of one and it was returned, so I have no interest

20   in leaving that on my list down the road.

21        So if we can figure out what the high-volume sellers

22   are, that's going to help us as well.

23        THE COURT:  So I'm with you on that.

24        Are you looking for something more?

25        MR. MCANDREWS:  No.  I wanted to make that the

1    defendants go away with the understanding that this is the

2    infringe technical guys only and --

3              THE COURT:  No.  I think I made myself pretty clear.

4              Mr. Day?

5              MR. DAY:  Your Honor, on that point, I'll say for the

6    record I disagree.  I don't think we should put damages ahead of

7    infringement.

8              THE COURT:  No, no.

9              MR. DAY:  But your position, clear.

10             THE COURT:  Okay.  Thank you.

11             MR. DAY:  These charts are designated "Confidential"

12   and --

13             THE COURT:  Well, before we get to the charts -- and

14   we'll get to that in a second -- but in terms of having an

15   understanding to have a meet-and-confer to try to submit an

16   order, we're all good here?

17             MR. DAY:  We understand the instruction, your Honor.

18             MR. CONNOLLY:  Your Honor, can I have clarification?

19             So, the discovery that's going to go forward is going

20   to be infringement discovery plus some limited damages discovery

21   about amounts of sales with the already identified accused

22   products?

23             THE COURT:  Well, what I would say is, relatively

24   speaking, I would call it summary damages discovery.  Something

25   that Mr. McAndrews can figure out what appears to be the most

1    productive targets for him to look at.

2             MR. CONNOLLY:  Okay.  And --

3             THE COURT:  I'm sorry.  Go ahead.

4             MR. CONNOLLY:  It's going to be limited, though.  I

5    mean I heard Mr. Day -- and it's not my client's preference that

6    we proceed this way -- but the Court has ruled.

7             But I think, as I understand it, it is going to go

8    limited to the products already identified, correct?  And it is

9    going to be summary kind of sales, there was mention of location

10   --

11            THE COURT:  Right.  I think it is reasonable to give

12   him an idea of what royalty basis for his claim, so sales in the

13   U.S. during the last six years, or the six years that are

14   relevant, assuming these products have been around for that

15   long.  I don't know.

16            Sort of by-product, because I'm sure that if you give

17   the product a number, your client also gives it a dollar figure,

18   right?  That's the kind of thing you're looking for?

19            MR. MCANDREWS:  That's right, your Honor.

20            THE COURT:  And I'm not meaning to limit Mr. McAndrews

21   to what I've just said, but I don't expect -- I'm expecting --

22   you know, I use the words "summary damages discovery."  That's

23   kind of the level that I'm trying to say, and I realize maybe

24   summary may be two other products, or 30 products.

25            But something, so he can tell which products are your

1    money makers.

2            MR. CONNOLLY:  All right, your Honor.

3            So, then, those are the two topics.  We're not going to

4    see discovery beyond those two topics.  That's the only thing I

5    want to leave with here.

6            THE COURT:  I don't know what other topics you have in

7    mind.  But in terms of invalidity, no, you're not going to see

8    invalidity discovery.

9            What else do you have in mind?

10           MR. CONNOLLY:  Well, that's chiefly what I had in mind.

11   I just want to make sure that those are the two topics.

12           THE COURT:  Okay.  Invalidity.  I'm hoping that if

13   things went well, maybe we can get that started in January?

14           But, you know, if things go well.  You know, somehow I

15   have the sense that I might even be seeing you before January.

16           But, in any event, I will see you in January, okay?

17           Have I clarified what you needed, Mr. Connolly?

18           MR. CONNOLLY:  You have.  And the only thing, if we

19   need to, is to come back with is the confidentiality.

20           THE COURT:  Yes, yes.  We'll come back for it.

21           Is there anything else?

22           Mr. Dorsney?

23           MR. DORSNEY:  One point for the record, your Honor.

24       We're not submitting an entire case schedule.  We're just

25   submitting portions of it.

1          THE COURT:  I think it makes sense to just submit what

2     you need to--

3          MR. DORSNEY:  The interrogatories and --

4          THE COURT:  You know, to the extent there are things

5     that have limits, it's going to be for entire case, but you're

6     not going to submit things with a trial date, or a pretrial

7     conference, and expert discovery.  That will be figured out

8     later.

9          So, basically, you need to do the things where you need

10    an overall number now, and the things at least will get us

11    through January.

12         MR. DORSNEY:  Exactly, your Honor.

13         THE COURT:  Okay.  All right.

14         So, these charts, Mr. Day?

15         MR. DAY:  Your Honor -- sorry -- the chart contains

16    publicly-available patents.

17         THE COURT:  I understand it is all public information.

18         MR. DAY:  Right.  It is all public information.

19         The only it thing that TQDelta claims to have added is

20    its work product.  Work product is not protected after you've

21    disclosed it.

22         So there is nothing in these charts that is

23    confidential, so there's no basis to claim, certainly not

24    outside counsel -- outside trial counsel only eyes.

25         And the prejudice to the defendants is, I think

1    obvious, but I can't show these charts to my engineers.

2         They're saying -- Mr. McAndrews is saying, oh, they

3    know exactly how they infringed.

4         That I know is false, because I can't sit down with my

5    engineers and show them the charts and say, you know, what's the

6    deal here?

7         They have to be fair.  They have agreed to let us

8    disclose to one of our executives, who I had to identify to

9    them, which is not a feasible way for us to move forward with

10   this, your Honor.  If these really were confidential, that might

11   be an approach, but they're not.

12        So, there is no basis to hamstring our case.  We can't

13   talk to our engineers.  We can't talk to our technical -- third-

14   party technical consultants, and we can't go out and talk to

15   third parties, like the chip maker, so we're prejudiced in this.

16        The prejudice that the plaintiff's identified that

17   somebody might take these to the PTO and try to instigate a

18   reexamination, and IPR, or something like that, that's the

19   natural result.

20        THE COURT:  Is there any reason, in that regard, why

21   you three wouldn't be the most likely people to be doing that?

22        MR. DAY:  I think that I would be speculating, but I

23   think there might be some chip makers out in the world who might

24   be interested in these.  I just don't know.

25        THE COURT:  Okay.

1          MR. DAY:  But it's the natural result of making

2    allegations in this case that those may be used in some way with

3    regard to these patents.

4          But I think an even more fundamental point is, your

5    Honor, these folks are saying they have patents that cover every

6    product that complies with these standards.  And it's unfair for

7    them to try to keep those positions secret.  The whole point of

8    patents, or at least one of the points, is to provide public

9    notice of what the patent covers.

10          THE COURT:  Well, of course, the patents are public.

11          MR. DAY:  Right.

12          THE COURT:  So they've filed suit.  So they're given a

13    certain amount of public notice.

14          MR. DAY:  That's true.  But the patents don't say, we

15    think we cover every product that complies with the standard.

16          That's the position that the patent owner has taken and

17    it is fair that that not be kept under wraps.

18          THE COURT:  Okay.

19          MR. CONNOLLY:  I want to add a point to Mr. Day.

20          There is a thing called the First Amendment.  This is a

21    Court.  And the plaintiff made a choice.  He decided to bring

22    the dispute in open court.

23          And in the Third Circuit, you're not allowed to have

24    closed proceedings.  And, so, that needs to be said and

25    considered by the Court at this time.

1          THE COURT:  Okay.  Even in that regard, it's not as

2     though he's had filings with the Court asking me to put them

3     under seal.

4          MR. CONNOLLY:  But there is nothing private in them.

5          THE COURT:  Okay.

6          All right.

7          Mr. McAndrews?

8          MR. MCANDREWS:  Well, your Honor, first of all, I

9     disagree with that basic premise that there is nothing private

10    in them.

11         I mean the whole point here is, the information has not

12    yet been made available to the public.  Therefore, by

13    definition, it is private and confidential.

14         The concern, your Honor, in addition to the Patent

15    Office proceedings where they could waived -- by the way, we've

16    literally had one of the defendants say, I can publish these on

17    the internet if I wanted to.

18         What purpose would be served if --

19         THE COURT:  Mr. Connolly, it sounds like a First

20    Amendment position.

21         MR. MCANDREWS:  I was on the phone with Mr. Connolly,

22    actually.  And maybe it was tongue and cheek, but the point is,

23    your Honor, we have the ability to taint a jury pool.  We have

24    the ability to create DJ jurisdiction for parties that we're not

25    interested in engaging with right now.  If this Court wants MDL

1    treatment with 40 defendants, then that might be a result of

2    making these documents public.

3           What I haven't heard, though -- so, what I can tell you

4    is that these documents have been maintained in confidentiality.

5           No party out there that we've engaged with has been

6    able to take these documents and freely share them.  We wouldn't

7    be having this discussion if that had happened, so they have

8    been kept confidential.  They are private documents.

9           THE COURT:  Well, they're not too private when you gave

10   them to the defendants.

11          MR. MCANDREWS:  I agree with that.  The defendants have

12   them.  And the defendants can use them as they need to.

13          I think it is unfair to suggest that they have somehow

14   been hamstrung.  I can show you the e-mails where we've offered.

15          If you can tell us that you need five engineers, we

16   will let you have five engineers.  In fact, I think we've done

17   that with ZyXEL.

18          We have said, you can show it to the engineers that

19   need to know, as long as those engineers agree to maintain the

20   confidentiality of these documents.

21          So they were designated "Attorney's Eyes Only," only

22   because all we had in place was the Default Protective Order in

23   the district, which requires Attorney's Eyes Only.  That's all

24   we had available to us at the time.

25          So, when the parties contacted us, they explained their

1    need to share it with their in-house people.  We were very open

2    to that.

3          In fact, we went as far as saying, if you genuinely

4    have a third party that you need to show this document to for

5    some reason, we would agree to that, as long as that third party

6    will agree in that confidentiality.

7          So, there is no prejudice here whatsoever, your Honor.

8    This can share these documents pretty much with whoever they

9    want subject to the Protective Order, subject to a party signing

10   on and agreeing to the bound by the Protective Order.

11         And the Protective Order is no good -- the

12   confidentiality is no good if there isn't some mechanism in

13   place for maintaining that confidentiality.  And there's a

14   downside, you know, contempt of Court, if they violate it.

15         But as to our ability to control these documents, it's

16   going to be an incredible burden on my client.

17         THE COURT:  And why is it a burden on your client?

18         MR. MCANDREWS:  It's a burden because third parties

19   will take this information and potentially file Declaratory

20   Judgment actions.

21         THE COURT:  Okay.

22         MR. MCANDREWS:  If we approach a party and say, we're

23   trying to comply with our FRAND application, as we've attempted

24   to do with these other parties, we have DSL patents that we

25   believe your products may practice, and you may need a license

1      on.  We would like to engage in negotiations with you outside

2      the scope of litigation.

3            Will you enter into an NDA with us, and will you sign a

4      Standstill Agreement, so that we can try to negotiate without

5      running to the Court?

6            We no longer will have that ability if these charts are

7      made public.  They will be used to maintain that there is an

8      actual -- actual case or controversy.  They'll be running into

9      Court with those documents.

10           So the defendants haven't explained any legitimate

11     downside that can't be addressed by a Protective Order that

12     allows them to share the information with somebody that has an

13     actual need to know.

14           THE COURT:  All right.

15           MR. DORSNEY:  Your Honor, if I could add one thing on

16     this point?

17           If we were down the road in this case, and they had to

18     prove a case of infringement in open court, they would have to

19     put these charts -- make them available.  They would have no

20     basis to seal the courtroom.

21           I don't see why that is any different today than eight

22     months from now or two years from now.

23           THE COURT:  You're in the First Amendment camp with Mr.

24     Connolly.

25           MR. DORSNEY:  I basically am.

1          And, at this point what we're trying to do is just

2     maintain its competitive advantage in the industry so they don't

3     go around suing a whole bunch of people and try to sue a whole

4     bunch of people without them ever knowing about it.

5          THE COURT:  All right.

6          Mr. McAndrews?

7          MR. MCANDREWS:  I'm just going to speculate, your

8     Honor, that eight months from now, and hopefully we will be that

9     far in eight months, but it's going to be the defendants that

10    are going to be asking you to clear the courtroom, because by

11    then we're going to have our experts weigh in.  We're going to

12    have their discovery.  They're going to have all sorts of

13    technical documentation that they've got 15 stamps on that

14    nobody else can see, all right?

15         So the hypothetical is actually --

16         THE COURT:  Did Mr. Farnan tell you how I would react

17    to that.

18         MR. MCANDREWS:  I imagine not very well.

19         THE COURT:  That should be a hint.

20         MR. MCANDREWS:  Judges don't like to put padlocks on

21    their courtroom doors, and I certainly understand why, but the

22    defendants, at least now they are stamping their documents

23    confidential.

24         In fact, in many cases, they are stamping documents

25    confidential that I could go on the internet on my phone right

1    now and find.

2            THE COURT:  Well, okay.

3            So they're bad children, too.

4            MR. MCANDREWS:  I didn't intend to swing mud that way,

5    your Honor.

6            But the point is, at this stage of the case, they don't

7    need to make these documents public.

8            THE COURT:  Mr. Day, I don't need to hear anything

9    more.

10            You know, this issue has come up multiple times.

11            When lawyers find out something that is work product,

12    and protected by the work product privilege, when the work

13    product disclosed to the opposing party, it ceases to be

14    protected by the work product privilege.

15            Here, the plaintiff is arguing for confidentiality of

16    its lawyer's work product, which cannot be protected as work

17    product, because it's been disclosed to the defendants.

18            Infringement contentions and their supporting claim

19    charts are not in and of themselves confidential information,

20    once they have been provided to the opponent.

21            See Medtronic Sofamor Danek USA, Inc. V. Nuvasive,

22    Inc., 2009 Westlaw 8590869, *2, Southern District of California,

23    August 13th, 2009.

24            Also, Constellation LLC v. Avis Budget Group, Inc.,

25    2007 Westlaw, 7658921, *1, Eastern District of Texas, October

1    30th, 2007.

2         I have read Exit Exchange Corporation v. Casale Media,

3    Inc., 2012, U.S. District Lexis, 40000, Eastern District of

4    Texas, March 23rd, 2012.

5         But I don't believe that's very compelling, because I

6    cannot tell what the underlying factual situation was that the

7    Court was dealing with.

8         I would note that the harms that are identified by the

9    plaintiff that it might be sued by chip makers, or other people

10   with whom it would like to license the patents if defendants

11   shared information, or information gets out, don't really strike

12   me as harm.

13        However, there are things that happened in the

14   marketplace, but simply everything that a party would rather not

15   have happen doesn't make it a harm.

16        I do, on the other hand, see restricting the

17   dissemination of these charts within defendants organizations to

18   engineers possibly with knowledge, or whatever, is actually a

19   harm as it would tie the hands of the defendants, or just make

20   it more difficult for the defendants to respond to the

21   plaintiff's allegations.

22        And, to some extent, there is a harm to the extent that

23   the defendants actually have to name the people in the

24   organization who are getting this information, as it would then

25   allow the plaintiff to actually track their thought processes,

1    would almost be a sort of reverse work product endeavor.

2         I guess like Mr. Connolly and Mr. Dorsney, but perhaps

3    stated slightly different, it is in the public interest to

4    understand how the patentholder perceives the scope and the

5    interpretation of its patents.

6         See the Constellation at *3.

7         Thus, I conclude that defendants are free to treat the

8    infringement contentions and claim charts however they want.

9         All right.

10        Is there anything else today?

11        MR. MCANDREWS:  No, your Honor.

12        MR. DAY:  No.

13        THE COURT:  All right.

14        So, do you think it is reasonable to expect that you

15   will meet-and-confer and submit this order by, say, the end of

16   next week?

17        MR. MCANDREWS:  Yes, your Honor.

18        MR. DAY:  Yes.

19        MR. MCANDREWS:  Your Honor, I'm sorry.  One additional

20   point.

21        The parties are working out a Protective Order.

22        How would you like us to approach it?  Should we submit

23   them at the same time?

24        THE COURT:  You can submit it whenever you get it

25   worked out, or, if you want -- you know, I get more extensions

1     of time over the submissions of Protective Orders than probably

2     any other single thing.

3          So, if you want to, if you can submit it at the same

4     time, that's fine.  But I wouldn't hold up the Scheduling Order,

5     just because you don't have the Protective Order.  Say in the

6     Scheduling Order what date you intend to get the Protective

7     Order done by.

8          And if you don't get it by that date, and you're having

9     a problem, you know, do one of two things.

10          Either submit it, you know, with little things that I

11     can cross out, you know, if they are the kinds of things that

12     can just be resolved like that.

13          If there are things that you want to talk to me about

14     how to resolve them, then follow the discovery dispute

15     procedures, okay?

16          MR. DAY:  Yes, your Honor.

17          MR. MCANDREWS:  Yes, your Honor.

18          THE COURT:  Okay.  Thank you.

19          MR. MCANDREWS:  Thank you, your Honor.

20          MR. DAY:  Thank you, your Honor.

21          (The proceedings adjourned at 10:33 o'clock a.m.)

22                    *  *  *  *  *

23

24

25